**IN THE COURT OF APPEALS OF IOWA**

No. 25-0617
Filed July 2, 2025

**IN THE INTEREST OF D.C.-C.,**
**Minor Child,**

**M.C., Mother,**
        Appellant.
_____

Appeal from the Iowa District Court for Linn County, Cynthia S. Finley, Judge.

A mother appeals the termination of her parental rights to her three-year-old son. **AFFIRMED.**

John J. Bishop, Cedar Rapids, for appellant mother.

Brenna Bird, Attorney General, and Lisa Jeanes, Assistant Attorney General, for appellee State.

Julie F. Trachta of Linn County Advocate, Cedar Rapids, attorney and guardian ad litem for minor child.

Considered without oral argument by Tabor, C.J., and Ahlers and Langholz, JJ.

**TABOR, Chief Judge.**

A mother, Margaret, challenges the juvenile court order terminating her parental rights to three-year-old D.C.-C.[1]  She contends the State failed to offer clear and convincing evidence that her son could not safely return to her custody.  She also argues that termination was not in D.C.-C.'s best interests because they share a strong bond.  But by Margaret's own admission, she was not ready to resume parenting at the time of the termination hearing.  And, as for best interests, the record reveals that Margaret is not a reliable placement for D.C.-C. given her inability to address her "long-standing issue" with alcohol abuse.  After careful review, we affirm the juvenile court's well-reasoned order.[2]

## I.      Facts and Prior Proceedings

D.C.-C. was born in August 2021.  In the ten months following his birth, the Iowa Department of Health and Human Services conducted three assessments involving the family.  Those assessments centered on Margaret's cognitive ability to care for the child, as well as domestic violence and substance use in the child's presence.  As D.C.-C. reached his first birthday, the State successfully petitioned to adjudicate him as a child in need of assistance (CINA).  D.C.-C. remained in his mother's care under a safety plan developed by the department.  To protect D.C.-C., the dispositional order directed the parents not to consume alcohol while caring for the child.

---

[1] The order also terminated the father's parental rights.  He does not appeal.

[2] "We review termination proceedings de novo, examining both the facts and law and adjudicating anew those issues properly preserved and presented." *In re A.R.*, 932 N.W.2d 588, 589 n.1 (Iowa Ct. App. 2019).  We are not bound by the juvenile court's factual findings, but we give them respectful consideration, especially on witness credibility. *Id.*

After the CINA adjudication, Margaret underwent psychological testing that showed her level of intellectual functioning, adaptive functioning, and daily living skills were low. Because of her intellectual disability, she was eligible for support. But she did not follow through with obtaining available services.

Still, by spring 2023, the department considered closing the CINA case with a bridge order to give Margaret sole custody of D.C.-C. As the case moved toward closure, Margaret was worried about losing her daycare funding. Then in November, she suffered a setback. Daycare providers believed that Margaret was under the influence when she came to pick up D.C.-C. They asked for a welfare check, and police officers found D.C.-C. holding a marijuana pipe when they arrived at his home. Margaret agreed to a breath test, which showed a blood alcohol content of 0.213. The court ordered removal, and the department placed D.C.-C with his maternal grandmother, who continued as his placement throughout this case.[3]

After the removal, Margaret had a substance-use evaluation, which diagnosed her with severe alcohol-use and cannabis-use disorders. The report recommended intensive outpatient treatment; she followed that recommendation. But she tested positive for alcohol twice in January 2024, despite telling providers that she had been sober since November 2023. On the positive side, she engaged in productive visits with D.C.-C.—twice per week, supervised by her mother.

---

[3] Margaret testified that her mother was a positive influence:

> She supports me with this whole situation. She rides me hard when I'm stepping out of line. She applau[ds] me when I'm doing right. She's done very well to help me take care of my baby boy when she doesn't have to. She stepped in when things got hard, and she's still there even when things aren't hard.

That spring, the State petitioned to terminate parental rights. Meanwhile, Margaret had progressed to semi-supervised visits with D.C.-C. The department recommended deferring permanency because Margaret was making progress. Indeed, by July 2024, the department approved unsupervised and overnight visits, and then a trial home placement with D.C.-C in October.

Unfortunately, the progress was short-lived. In December, Margaret called the case manager for a ride to pick up D.C.-C. at daycare. Margaret appeared to be under the influence.[4] When the case manager checked the apartment, she found several packs of beer and THC cartridges in Margaret's closet. Another evaluation confirmed the diagnosis of severe alcohol-use disorder, and the provider made the same recommendation of intensive outpatient treatment that Margaret had received a year earlier. Margaret later acknowledged that she drank regularly on weekends when D.C.-C was staying with her mother.

The juvenile court scheduled the termination trial for March 2025. Margaret testified that after she first started outpatient treatment, she told her counselor that "when my son is with my mother on the weekends, I would occasionally have a drink, not every weekend, but here and there, just a little bit, a few drinks." But Margaret said she could not maintain moderation—"it just progressed more, and . . . I became a hot mess." When examined by the State, Margaret agreed that her son "can't come home today." And she said that she needed sixty days to establish her sobriety. But when cross-examined by her counsel, she shifted her position,

---

[4] A drug test Margaret provided that day was negative for all substances. Margaret testified that she "drank a bunch of coffee and a bunch of energy drinks" before the case manager picked her up.

agreeing that her son "would be safe in [her] care if he were returned to [her] today."

In its order terminating parental rights, the juvenile court questioned Margaret's credibility. The court doubted her testimony that she reasonably believed she could drink alcohol as long as D.C.-C. was not in her care. The court also emphasized that Margaret had "not been able to demonstrate any prolonged period of sobriety." The court terminated her parental rights under Iowa Code section 232.116(1)(h) (2024). Margaret appeals that order.

## II.     Analysis

We review termination cases in three steps. *In re A.B.*, 957 N.W.2d 280, 294 (Iowa 2021). First, we assess whether the State has proven a statutory ground for termination under Iowa Code section 232.116(1). *Id.* Second, we examine whether termination is in the child's best interests under section 232.116(2). *Id.* And third, we decide whether a permissive exception under section 232.116(3) should apply to preclude termination. *Id.* We need not address a step if it is not disputed by the parent. *See In re P.L.*, 778 N.W.2d 33, 40 (Iowa 2010).

### A.  Statutory Ground

We begin with Margaret's claim that the State did not prove the fourth element of section 232.116(1)(h). She contends that D.C.-C. could be safely returned to her custody at the time of the termination hearing. *See* Iowa Code § 232.116(1)(h)(4) (requiring clear and convincing proof that the child cannot be returned to parental custody as provided in section 232.102 at the present time); *see also In re L.M.*, 904 N.W.2d 835, 839 (Iowa 2017) (finding "at the present time"

means the date of the termination hearing). She now insists that she "has steadfastly and comprehensively addressed her alcohol use."

But we are more convinced by her frank testimony at the termination trial that she needed more time to achieve stability before resuming custody of D.C.-C. No doubt, Margaret has taken steps to address her sobriety. But her incapacity to safely pick up her son from daycare in December 2024 signaled an ongoing risk to his welfare if returned to her custody. The juvenile court offered an apt description of the evidence:

> Margaret has participated in substance abuse treatment multiple times, yet in December 2024, approximately three months before trial, she had the intention of consuming alcohol without regard to the warnings of her substance abuse counselor, her AA sponsor, and [the department]. All while involved in the child welfare system and in jeopardy of losing custody of her child permanently. Certainly, she could not be trusted to do better if [D.C.-C.] were returned to her care and there was no court or [department] oversight.

On this record, termination was proper under paragraph (h).[5]  *See* Iowa Code § 232.116(1)(h).

### B. Best Interests

Margaret next argues that termination was not in her son's best interests, citing their "very strong bond." She asserts that she has been "the sole caretaker

---

[5] Our case law offers two formulations for what it means when a child "cannot be returned" to parental custody as provided in section 232.102, which discusses transferring the child's custody if staying in the home would be "contrary to the welfare of the child." Many cases cite *In re M.M.*, 483 N.W.2d 812, 814 (Iowa 1992), which provides that a child cannot be returned if it would expose them to "any harm amounting to a new child in need of assistance adjudication." But our supreme court often describes the fourth element as the inability to "safely return" children to their parents' care. *See, e.g.*, *In re T.W.*, No. 20-0145, 2020 WL 1881115, at *1–2 (Iowa Ct. App. Apr. 15, 2020) (collecting cases). Under either formulation, the State met its burden here.

of D.C.-C. most of his life, and during that time she was always a loving, protective, capable, and nurturing parent." Moreover, she urges that termination would cause "incalculable but certain harm to D.C.-C."

Although Margaret's argument "conflates a best-interests argument (step two of the three-step process) with a permissive-exception argument (step three of the three-step process), we interpret [her] argument as a challenge under the second step." *See In re L.A.*, 20 N.W.3d 529, 534 (Iowa Ct. App. 2025). When deciding best interests, we apply the framework of section 232.116(2). *P.L.*, 778 N.W.2d at 37. We give primary consideration to D.C.-C.'s safety, to the best placement for fostering his "long-term nurturing and growth," and to his "physical, mental, and emotional condition and needs." Iowa Code § 232.116(2). We also recognize that his "mental and emotional condition and needs" are affected by his bond with his mother. *See L.A.*, 20 N.W.3d at 535.

In deciding termination is in D.C.-C.'s best interests, we are persuaded by his guardian ad litem's balanced viewpoint:

> [A]lthough it is clear that [Margaret] loves her son and that they have a strong bond, since the time of the removal in 2023, she has struggled to demonstrate that she is able to maintain her sobriety on a long-term basis. [D.C.-C.] is only three years old with very limited ability to self-protect. He needs a sober, stable caregiver at all times who is capable of meeting all of his care and supervision needs. When [Margaret] relapses she has historically not been honest and forthcoming about her struggle until it is evident and out of control. During her most recent relapse, she continued to provide care for [D.C.-C.] despite being under the influence and as a result put [him] at significant risk of harm.

The record shows that D.C.-C. is comfortable in the home of his grandmother, and she "has expressed that if it came down to it, she would adopt [him]." *See* Iowa Code § 232.116(2)(b). Under these circumstances, it is in D.C.-C.'s best interests

to move toward permanency and adoption by terminating Margaret's parental rights.

**AFFIRMED.**